All right, everyone's here. Thank you. The second case on our docket this morning is 18-60302. It's Consumer Financial Protection Bureau v. All American Check Cashing. Mr. Shelfer. Thank you, Chief Judge Owen, and may it please the Court, Lachlan Shelfer, on behalf of All American Check Cashing, Midstate Finance, and Mr. Michael Gray, I'll be splitting my time with my colleague, Mr. Christensen. I will address the remediable constitutional injuries that All American has suffered, both from the for-cause removal provision and from the ongoing appropriations clause violation, and my colleague will explain why the ratification doctrine cannot apply here. I want to begin by emphasizing how radically different the posture of this case is from an affirmative challenge like Collins. This is an enforcement action. All American has raised the agency's constitutional defect as a defense to that action. All American was suffering a remediable constitutional injury at the time that it raised that defense. The CFPB does not dispute that the president wanted to remove the director at the time that we raised this defense. The Collins court asks the court to look at whether the president wanted to remove the director but was thwarted because of judicial decisions and because of the statute, and that is exactly what happened here at the time that All American raised this defense. All of the decisions, the judicial decisions that had been issued had upheld the provision. The one case that had gone the other way, then Judge Kavanaugh's PHH panel decision, striking down the for-cause removal provision, that had just been vacated by the D.C. Circuit to go on bonk, and that same month, February 2017, the press was widely reporting that the president wanted to remove the director but felt inhibited because of these judicial decisions and decided to let the judicial process run its course. So under that test, that is Collins' test, we have suffered a remediable constitutional injury. CFPB does not dispute that. Rather, the CFPB attempts to take its ratification, which it had entered into because it conceded that there was a constitutional injury for years, and it tries to repurpose that ratification into evidence that in a counterfactual world where there were no for-cause removal provision and there was a different director at an earlier time that there would have been no change in the CFPB's prosecutorial enforcement decisions. But that counterfactual test, whatever its application in other contexts, we would submit it does not appear in the Collins majority opinion. We think that's just in Justice Kagan's concurrence. We think it's actually rejected in the Collins majority opinion, and it would be particularly inappropriate in a context like this of an enforcement action to hypothesize about a counterfactual hypothetical world. Rather, what happens when the court is confronted with this sort of quasi-criminal enforcement action and the defendant raises the agency's defect as a defense, the court simply rules in favor of the defendant. That's what happened the D.C. Circuit did in cases like NRA Political Victory Fund. That's even the Supreme Court in SELA law contemplated that dismissal would be the straightforward remedy in a case like this. And that the court does not try to parse the precise degree or timing of a particular harm when the error is a structural constitutional one like we have here. And it makes good sense. If individuals could not get meaningful relief for raising a successful structural constitutional challenge successful here and win as a defense and get no remedy, first, there'd be no incentive to raise the constitutional issue in the first place, which the Supreme Court in Lucia and Ryder and other cases have emphasized is a very important consideration for the court to consider when crafting its remedies. Second, it wouldn't be a defense at all. The defendant would receive no remedy for an admitted constitutional injury while the government could simply continue about its business with impunity. But that's not the case here. There are certain consequences when Congress enacts such a blatantly unconstitutional law, perhaps the most blatantly unconstitutional agency structure in a generation, and then proceeds to leverage the insulation that the agency has from any democratic accountability to bring affirmative quasi-criminal enforcement actions against private parties. There are real liberty interests at stake in an enforcement action. There are the individual rights of the defendant that are implicated. There are also, yes, Judge Jones. I'm sorry. I have two quick questions. Number one, is this case like the Legitech case in the D.C. Circuit? Your Honor, my colleague, Mr. Christensen, will explain why the ratification doctrine should not apply here. Legitech in that case, the D.C. Circuit applied the ratification doctrine, but did not apply the factors that the Supreme Court had outlined in its decision in NRA Political Victory Fund. So we would argue that that Legitech was wrong to apply ratification in this context. Okay, well, I'll let him address that. My second question is, after Selah Law, is the director of CFPB still not required to bring his budget before the OMB? Your Honor, after Selah Law, my understanding is that everything has stayed the same with the budget. Well, the law said that. So Selah Law only had to do with removal, not with insulating him from OMB and the appropriations process and not having to vet regulations through OIRA, correct? That's right. The Supreme Court did not address any of that. Thank you. And if I could turn briefly to the appropriations clause since that was brought up, I just want to briefly explain why the CFPB is so radically different from any other agency that Congress has ever established. Congress has never so thoroughly abandoned its constitutional duty to take accountability for and to oversee an agency's finances. And it does this in five ways. The CFPB wields its own appropriations power without any time limitations, without any amount limitations, up to 12 percent of the Fed's budget, hundreds of millions of dollars a year and counting. Three, without any object limitations, Congress simply allows the director to raise and expend the funds in any way he deems reasonably necessary to carry out the statutes. Four, without any congressional oversight, the statute forbids the House and Senate appropriations committees from reviewing the CFPB's budget. And five, finally, the really unprecedented aspect, the CFPB is protected by an unprecedented two layers of insulation from any accountability over its appropriations decision. Now, Congress has in the past in a few handful of instances authorized a few agencies to raise their own budgets without any time or amount limitations. But those agencies have been funded by imposing fees on regulated parties. And so there's at least a substitute check that exists, the natural resistance of those regulated parties to the CFPB or to those other agencies' impositions and their ongoing relationship. But the CFPB doesn't even have that substitute check on its discretion. And yet it is more insulating. So let me ask you about the distinction you made. You're familiar with this. In state law, Justice Thomas and Gorsuch talked about other agencies that were outside the usual appropriation process, which is the FDIC, Federal Reserve, other opinions and other agencies. So your position is, how much, let me ask, how much of what is done here is unique? Because there are other agencies that you have acknowledged that are independent of the usual appropriation. So are you emphasizing that last factor in particular, the double insulation? Is that the same as some of these others? What I'm emphasizing, Your Honor, the double insulation is very important, I think, because one very important consideration that the Court needs to consider is the unprecedented degree of insulation, that Congress has never done this before, and that in itself is a telling indication of a constitutional problem. And also, in those circumstances, especially with the Federal Reserve, for instance, the justification for that independent appropriations power has been, for the Federal Reserve, for instance, to have an independent actor that is not subject to any in charge of fiscal monetary policy. But that has no application to the CFPB, which, after seal of law, is as political as anything. Essentially, the agency is an arm of the president. And yet, it's more insulated from congressional review or responsibility to regulated parties or any accountability than any agency in history. It seems to me that a lot of what you're saying is a fairly commonsensical interpretation of the Constitution and how this might work best. What is your best case, though, that supports that this invalidates the structure or the funding that Congress enacted here? Well, that's an important point, Your Honor. So there, to date, courts have not considered this particular issue when Congress abdicates its own budgetary oversight responsibility. There have been several law review articles that have filled the gap, such, I would point the Court in particular to Kate Stiff's, Professor Kate Stiff's article, Congress's Power of the Purse. But courts have not yet waded into that particular question. But I think it is a crucial question that is raised here. But in many ways, it resembles- So you said there's no case that is waded into the issue. Where in the Constitution's text are you finding these limits on Congress's to exercise a long-term funding mechanism or even a permanent funding mechanism, given that any time tomorrow, Congress could end the whole agency, which is always true? Well, so a few responses to that, Your Honor. So first, textually, the Appropriations Clause first is located in Article I, Section 9, which lists limitations on Congress's Section 8 powers. And when reading the Appropriations Clause, the purpose of that clause is to impose certain duties and obligations on Congress. Otherwise, Congress could end run around those requirements and simply allow the President to raise as much money as he wants every year, up to $10 trillion, simply to fund the federal government and carry it out as he deems reasonably necessary. And the appropriate money for an agency? It is not, Your Honor. No, as I said, there are agencies that exist without amount or time limitations. This one combines a constellation of defects that has never before seen. Amount, time, no object limitations, no congressional oversight, and not even a substitute check on its discretion. It's simply able to- Judge Jenkins, am I correct that the district court didn't pass on your congressional abdication argument at all? It did not address that issue. The court's decision is not very long. It simply adopts the PHH decision, the en banc DC Circuit decision. No, I mean, the decision, it's 11 pages and it's got four sections. And the third section is about a non-delegation argument, but it doesn't speak to funding at all. That issue simply was not addressed by the district court, correct? The court did not, yeah, did not wade into the appropriations. And then the only other quick question I have is, is when you say there's no case on the CFPB's funding mechanism, the CFPB in its final footnote listed half a dozen district courts. Am I correct? Your reply brief didn't respond to any of them. If so, would you give any response to those district courts? Are they wrong? Are they distinguishable? What's your thought about them? I think, yes, I meant that at the appellate level or the Supreme Court level, they're not binding. Do you have any insight into those half dozen district court opinions from 2014 to 2020 that addressed the CFPB's funding mechanism? Yes, Your Honor. So none of those decisions grappled with the distinctions that we've raised in our briefs that I've raised today that the CFPB is insulated from any democratic accountability from Congress or from any substitute check to a greater degree than any agency in history. Those courts did not grapple with that argument. And we submit that this court would be the first to address the issue. At the very least, you add to the appropriations anomaly here, the fact that unlike other self-funding agencies, the scope of authority of the CFPB over the entire American economy is almost unprecedented, certainly in comparison with those other self-funding agencies. That's right, Your Honor. The CFPB is very different from that handful of other agencies. As we've briefed, they're very narrowly focused, mostly on the finance industry. And the CFPB, by contrast, has broad enforcement authority against private parties across the nation, enforcement, regulatory, adjudicatory authority. It is an arm of the president now that can act without any oversight or check on its discretion that the appropriations clause was there to provide. With that, I'll hand the floor over to my colleague, Mr. Christensen. May it please the court, Jeremy Christensen on behalf of Defendants Appellants. As my colleague, Mr. Shelford, has established, our client has suffered a constitutional remediable injury. I'd like to discuss, with the court's permission, three related issues. The first, why we think ratification does not apply, and I will turn quickly to Judge Jones's question about Legitech on that point. Second, even if this ratification doctrine is applicable, why the ratifications on the record here are faulty and do not change the outcome that our client is entitled to a for equitable tolling are meritless. So turning to Judge Jones's question about Legitech, our response there would be that while we do acknowledge that other courts of appeals have applied the ratification doctrine from NRA Political Victory Fund and the Supreme Court to, say, appointments clause violations or the like, advanced disposal in the Third Circuit would be another example, that the Supreme Court has never said that this doctrine would apply to a structural constitutional violation, that an agency is capable of ratifying that kind of violation. And we think, in some sense, it's a bit of a square peg in a round hole, because what Collins asked the court to do is look at whether there has been an injury. And as my colleague has and a thousand and one ratifications after the fact don't do anything to go back in time and cure the injury that our client suffered at that time. So we think that that would be a reason not to apply Legitech. Another reason, however, is that we think Legitech is wrong, and quite clearly so, in its failure to actually apply the two prongs of NRA Political Victory Fund. The court simply glosses over that. It does not do so. But when other courts of appeals have addressed this question of ratification, like in Legitech, they apply this two-pronged test. And I'd like to turn to that test, because I think it's quite important. This is now the third time that this case has been before the court, twice in the panel context and now in the en banc. It is simply, we have never heard from the CFPB any contradiction that, in fact, the agency knew of the violations that form the basis of the complaint no later than the issuance of the CID on September 3, 2014. And under the second prong of NRA Political Victory Fund, the court has to ask, at the time of the purported ratification, did the party ratifying have the power to do it? And the court specifically relied on statute of limitations cases to say that the time is ticking and the time can run. Acting Director Mulvaney's purported ratification occurred in February of 2018. So the relevant time period, and this is also, I have not heard the agency dispute this in any of our multiple rounds of briefing, that if the agency had knowledge before February 5, 2015, that it cannot ratify under the second prong of NRA Political Victory Fund. And if the court turns and simply looks at the record, we think this is a question that can be resolved 100 percent here before the court by looking at what the agency knew. So on accounts 1 through 4 of the complaint, which address all Americans' alleged check cashing policies and practices, the September 3, 2014, civil investigative demand was issued, and I direct the court to pages 3351, 3357, and 58, and 3411 of the record on appeal. The agency specifically and in great detail inquired after the check cashing policies of our client. As this court held in CFPB versus source of public data, a civil investigative demand is, and I'm quoting here, it must describe, quote, the nature of conduct constituting an alleged violation. That is what the CID does. As a matter of law, it demonstrates the agency's knowledge. And even if, so the CFPB responds in their briefing, well, an investigation is not discovery under the statute. The problem with that is even if that were correct, and I can address some reasons why it's not, certainly the agency knew by no later than October 3, 2014, when our client submitted tens of thousands of documents in response to that civil investigative demand, and further in January when even more documents were provided to the agency in 2015. If the court also looks to count five of the complaint, this is all Americans' first and third lending program, the agency, the joint investigation of our client with the state of Mississippi. There's a common interest agreement, a record on appeal 313 between the two agencies, discusses information sharing and the like. On June 19, 2014, the state of Mississippi issued a cease and desist letter as a part of this investigation ordering All-American to cease its first and third lending program, calling it out by name and describing it, which All-American then did that very day. And the CFPB's own papers below in the district court point the court to record on appeal 3242 through 3243, says that the claims based on the first and third lending program are based on conduct, quote, from July 21, 2011 to June 19, 2014, the day of Mississippi's cease and desist letter. And at record on appeal 3411, again, the agency shows in the civil investigative demand in September of 2014 that it had knowledge of those claims, and rightly so. It was conducting a joint investigation with the state. The same is true for count six. To round it out, this is about the failure to notify consumers of overpayments. The complaint certainly does not allege any conduct past 2014. The CFPB's papers, this would be at record on appeal 3251, says that the overpayment claims are based on conduct, quote, between October 2011 and July 2013. And again, at record on appeal 3351, the civil investigative demand in September 2014 evinces clear knowledge of these claims. And that is what the framework of NRA Political Victory Fund asks the court to look at under the CFPA's three-year statute of limitations. Did the agency discover did the agency discover, I want to get the precise language here, violations more than three years after the date, it runs more than three years after the date of During multiple years of litigation, the CFPB's only real response has been to say that this question can only be resolved on the pleadings. We don't think that's true. They have not denied that, in fact, they did know about this. And it wouldn't make much sense to resolve that question on the pleadings, given that, one, the CFPB under this court's case law bears the burden of proving that the ratification is valid, including its timeliness. And two, the ratifications are not on the pleadings. The ratifications are material that the CFPB lodged into the record, making a filing in February of 2018, with a brief arguing for the sufficiency of those ratifications, and to which we responded in the district court. I think that the agency's and that, therefore, it cannot meet the second prong of NRA Political Victory Fund. Those ratifications don't change a thing. That takes us to the final point, and I think it's quite telling that the agency has gone to equitable tolling. I think the reason for that is that the agency knows it can't pass the test under NRA Political Victory Fund, and so Mr. Shelford, have you identified why CFPB fails the first prong of NRA Political Victory Fund? So we have argued in our briefing that they did not have the authority to bring this in the first place. I think the way the court can look at it under Collins is that what Collins asks is to identify an injury that is caused by the forecast removal provision. And here, we think that what essentially has gone on, we have a provision that certainly the administration prior to the Trump administration believed gave Director Cordray power to do what he wanted, that he could not be removed by the president. So certainly, under this sort of functional test Collins is putting forward, it affects the behavior. And second, once you look at an individual who did want to remove Director Cordray and did not because of the statute and the en banc order and PHH and the other court decisions, we think that in this defensive posture, it simply makes most sense to say there's an injury, just like the kinds of injuries the court in Collins identified that occurs with an Appointments Clause violation or an Article III violation, so that once that injury is shown, we're sort of taken back into that realm. But even if the agency had authority under Prong 1, it's really not, it doesn't change anything because they have to meet both prongs. All of the courts of appeals that have applied that test have applied it that way. So even if there was authority in the first instance, there isn't under Prong 2. Just very quickly on equitable tolling, we would emphasize again, as we did in our briefing, the agency waived this argument, and they do not, they don't contest that they failed to raise it in the district court. This is at their second en banc brief, page 24, note 13. Their argument is instead they did not have a fair chance to raise it. We think the record belies that. They filed their ratification in a brief on February 5, 2018. We responded on this entire time and argued, and the CFPB simply chose not to respond to that. So I think the record belies the point that they did not have an opportunity to meet their burden to show that the ratifications were timely. And with that, we would simply urge the court to reverse the judgment of the district court and enter judgment for our client. What's the remedy here? So we think that the remedy is that. So our client is in a defensive posture. It's a different set of concerns. And we're talking about a, say, a proactive plaintiff side suit. We do think that that's a meaningful distinction here. As was pointed out, I believe, by Judge Oldham in the earlier argument in Collins, there's not really any dispute that a remand is going to have to happen because the district court was wrong on the constitutional question. I don't know if the agency is contesting that, but certainly we would agree a remand has to happen so that judgment on the constitutional question should enter. And under the D.C. Circuit's decision and NRA Political Victory Fund, the proper remedy, the ordinary remedy for a defendant is dismissal. That's what gives meaningful relief to someone who is a defendant. Without that kind meaningful relief, there's simply no way that private parties are going to raise these kinds of defenses. And we think that would be a very bad precedent for the separation of powers. But your position is we should remand the question of remedy to the district court? No, we think that the court should order the remedy of judgment and dismissal. That's the ordinary remedy that should obtain because the agency can't meet the ratification test. So it can't say that the action should proceed, that the ordinary remedy is judgment and dismissal. We're here on a motion for judgment on the pleadings. And so as common courts review judgments, that is what is before the court. And we think that judgment should be given for our client, which is effectively a dismissal. Thank you, counsel. Mr. Deal. Thank you, Your Honor. May it please the court, Christopher Deal for the Consumer Financial Protection Bureau. I'd like to start with three points to show why defendants are not entitled to judgment on the pleadings. First, the unconstitutional removal provision in the Bureau statute didn't affect the filing of the complaint in this case. The Bureau filed its complaint in May 2016. At that time, President Obama was in office and Director Cordray led the to remove Director Cordray. Second, the removal provision didn't prevent President Trump from ordering the Bureau to dismiss the complaint. We know this because two different directors who were selected by President Trump and unquestionably removable by him at will had the chance to dismiss the Bureau's claims, but they chose not to do so. Just the opposite, in fact. Acting Director Mulvaney and Director Kraninger each formally ratified the complaint. Third, under the Supreme Court's decision in Collins, each of the Bureau's directors lawfully possessed the power to authorize the Bureau to bring and pursue this enforcement action. As a result, there is no reason to regard any action taken by the Bureau in relation to this case as void. When you put those three pieces together, it's clear the defendants were not harmed by the removal provision. The removal provision didn't affect the filing of the allegations in the complaint, and neither the complaint nor any other action the Bureau has taken in this litigation is void. We think the result is clear. The Court should affirm the District Court's denial of the defendants' motion for judgment on the pleading. Defendants' contrary argument on the merits is that they suffered harm in light of non-record evidence that President Trump would have preferred to replace Director Cordray at some point between January 2017, when President Trump took office, and November 2017, when Director Cordray resigned. But any delay in Director Cordray's removal didn't harm defendants, because after Acting Director Mulvaney took over, he formally approved the filing of the complaint. So defendants cannot explain, they have not explained, how President Trump's purported inability to remove Director Cordray could support dismissing a complaint that was filed eight months before President Trump took office, and which was formally ratified by two different officials, who were selected by Trump, President Trump, and who are fully accountable to him. Mr. Diehl, Judge Higginson, I'm going to ask the same question I asked opposing counsel. If you're right that judgment of dismissal from our court's not appropriate, what is the relief you want, specifically, if I'm correct that All-American did preserve a separate Article 1 non-delegation argument, but there was no hearing in the district court, and it appears to me the district court just missed that issue, but it's still there, isn't it? Your Honor, I don't think that that, I'm not sure to what degree that issue traveled with the, up to this court on the interlocutory appeal. But if it didn't travel with it, it's still a live issue, right? That was one of their arguments, or do you disagree with that? Uh, we have not disputed their ability to raise that argument before this court, so I think the court can address it if it chooses to do so. We think that Article 1 argument is totally without merit, as evidenced by the fact that they are unable to identify any case that holds what they think the Appropriations Clause means, and they were unable to explain how their vision of the Appropriations Clause accords with the terms of the Appropriations Clause, which are, which restrict money from being spent unless authorized by law here. All the money that the Bureau spends is authorized by law, so I think the court can fairly address the question that defendants have raised. Well, counsel, where's your case that supports the appropriations scheme that's set up here? Uh, sure, Your Honor. Cincinnati Soap, uh, from the Supreme Court, uh, which, which we cite, uh, I think the, which, which holds that, uh, the president, that the, that Congress can delegate to, uh, uh, officials the, uh, authority to, you know, there's not a non-delegation problem with, um, with broad, uh, uh, appropriations that are not limited in amount, uh, which is, of course, not what we, what we have here. Uh, here, by contrast, there is a specific... Mr. Deal, uh, Judge Jones here. Um, Cincinnati Soap was about, uh, uh, the terms of a, uh, appropriation or a, a use of funds authorization to the president in his capacity, uh, dealing with the territory of the Philippines. So though it's, it has ostensibly a domestic focus, the balance of Justice Sutherland's decision has to do with territorial, uh, powers of the with no accountability, little accountability to the, uh, presidential budget process, even after sale of law and explicitly excluded from appropriations hearings by both the House and the Senate flow naturally from Cincinnati Soap. Your Honor, I'd like to, if I may respectfully, uh, take issue with the premise of the question, uh, here, the president has plenary authority over the Bureau. The president can direct the, if the, if the president wanted the Bureau to take any action, the president, the, the Bureau could voluntarily submit, uh, budgets to OIRA. It could, uh, you know, it could, it, the president can direct the Bureau to, to, to do what the president thinks is appropriate. Uh, and there has been no, no indication that, that, that, uh, that there's any, uh, restriction on the president's ability to handle this issue. And I would note that in, in sale of law, OIRA during, uh, director Cordray's tenure at OIRA before, I mean, uh, CFPB, um, they, they took issue with a lot of, uh, things that the president tried to do, including removing him. So, or removing the acting director, if I recall correctly, the statute still says that the budget of CFPB does not go to the OMB. Your Honor, we don't think that that makes a constitutional difference as the Supreme Court's decision in sale of law makes clear. The, the Supreme Court surveyed the, uh, the, the method of the Bureau's funding. It surveyed the restrictions on, uh, review, uh, for the budget. And then it said the only constitutional defect we identify, have identified in the Bureau structure is the director's insulation from removal. If the director were removable at will, the constitutional violation would disappear. So we think that that argument is, is no longer available in light of, of sale of law. And I would note that Congress has the ability, you know, by statute, the Bureau is required to submit reports to its committees of jurisdiction, uh, and is required to appear for hearings about those reports. And one of the subjects of those reports is its, is its budget. So if, if Congress wants to oversee the, the, the, the Bureau in that manner, it is certainly able to do so. And I note that the Constitution does not mandate the annual appropriations process. It doesn't mandate anything with respect to how Congress organizes itself, which committees are in charge of, of which matters. That's something that's left to Congress and Congress has exercised. Well, no, no canning placed a great deal of reliance on the historical practice, uh, of, of the, uh, recess appointments clause in order to determine that that particular recess appointment was unconstitutional. Appropriations have generally been on an annual basis ever since the founding, the existence of an, of a, uh, appropriation without a time limit, without an, uh, uh, amount limit with no objective limits on what the agency can use the money for, uh, is, is unique. Your Honor, I'd respectfully disagree with that. Uh, and I would point the court to the, uh, the office of the comptroller of the currency, uh, which, uh, which is removable, whose director is removable by the president, uh, for any reason stated, uh, that is an agency that for the last, as I understand it, 150 years has had greater, much greater budget autonomy than, than the Bureau has. The Federal Reserve is the same way. The FDIC is the same way. I think the argument is legitimate, however, when you talk about agencies that regulate the financial institutions of the U.S., which include the banks and the mortgage companies and, and Federal Reserve and its authority, they exist on self-funding via fees, fees from the regulated parties that you can also contend that they perform a service to those regulated parties in addition to the public by maintaining public confidence in those institutions through their regulatory activities. CFPB exists for an entirely different purpose. Your Honor, three points in response to that. Uh, first, I would note that, uh, by comparison in, in the Supreme Court's decision in Collins, it specifically said, this was in the removal context, quote, courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies. And I think that that, uh, that reasoning applies with full force in, in the appropriations context. The, the appropriations clause doesn't say some money can be drawn from the treasury, you know, depending on what the government is doing. It says no money shall be drawn. And we think that the same rules apply across, across the government. The other thing I would note is that the, you know, some agencies are not necessarily, are, my understanding is that the Federal Reserve, for instance, is not, uh, funded through fees. It's funded through its, uh, open market activities. I think that that's, uh, that's different. I also emphasize that there is the, the Bureau, the amount of the Bureau's funding is capped by statute. Let me ask you a question. Let me ask you a hypothetical, Mr. Deal. If the setup of the CFPB with this broad enforcement authority across the scope of financial transactions or lending or credit extensions throughout the entire economy is regulable by the CFPB, why couldn't Congress create an agency called the Internal Revenue Agency with a sole director whose money, who was self-funded by a percentage of the tax collections every year? Forever. I don't think, I don't think that the Bureau would be the example to justify that. I'm talking hypothetically. No, I understand your honor. And I would suggest that to the extent that that is allowed, it's based on the example of the Federal Reserve, based on the OCC, based on the FDIC, uh, all these other agencies that are self-funded through fees. Whereas the Bureau's funding is not set up so that the Bureau can draw, can pick its amount of funding. Instead, Congress capped the amount of funding that the Bureau could, could use. Congress could cap the amount of funding that the director of the Internal Revenue Agency received at $500 billion a year. But it could still say that the director has the right to collect that tax, a percentage of the taxpayers and tax collections, uh, forever, according to the logic of the way in which CF, I mean, you know, you can't, yeah. Your, your honor, I, I think that the, again, I would, I would point the court to the, the language in Cincinnati. So I would also note the, uh, both the majority opinions and the concurrence in the city of New York versus Clinton case, where the courts, uh, go through the historical, uh, practice of, of very, very large appropriations with, uh, very limited direction. I think when you compare the CFPB's appropriation to those appropriations, it is clear that we are nowhere close to any line. And also note that in, uh, your honor's hypothetical that I don't see how there's necessarily, it may be an unwise exercise of the, the Congress's appropriations power. But if Congress says, here's the amount of money that you can spend executive, here's what you're supposed to spend it on. That is entirely consistent with the appropriations clause. There might be other problems, uh, with that kind of an agency, but there, I don't, uh, respectfully see how there would be an appropriations clause issue there. Is there another agency that has the double insulation? In other words, where the funding is not only indirect, but it's doubly indirect. Your honor, I would, uh, respectfully just kind of dispute the premise that there's any kind of double insulation or, or multiple layers that make any difference here because Congress, is there another agency like this though? I, I'm not aware of another agency where the, uh, amount is drawn from a specified fund, uh, from another agency. I would note the court in Cincinnati soap said that, uh, it's up to Congress if it wants to say that the quantum of a particular appropriation in that case was based on it, on a particular tax here, Congress said, Bureau, you can draw up to X amount of money each year, and here is the source of that money. Here's what you can spend it on. Uh, and, and that, that is just a, that there is no constitutional difference between that kind of an appropriation and any other one. And I would, uh, submit that because our funding is actually capped, we are, if anything, more accountable to Congress. That's the cap. Uh, and so there is there, we are, the Congress's ability to change that cap to adjust it is just exactly the same as with any other agency that's funded, uh, outside the annual appropriations process as with any other funding, again, that's, that's outside. Mr. Deal, um, returning to a question that Judge Wilson asked opposing counsel, assuming arguendo that we were not persuaded by your arguments, um, and we believe the dismissal was appropriate, would we need to remand to the district court for some reason, or would we just render the judgment? I, I, I would, uh, obviously urge the court not to reach that result, but, uh, I think if you that the case would go back to the district court for entry of, of judgment, but, uh, I confess I have not, uh, considered that, that, the mechanics of that issue. Uh, I, I would note that, um, if I might, uh, return to sort of the, the non-appropriations issues in the case, uh, that the, there's no, the defendants have been unable to identify a theory, uh, of harm that would entitle them to the dismissal that they seek, because defendants are asking to be put in a better position than we know that they would have been in had, uh, President Trump, even if President Trump had removed Director Cordray on day one in January 2017, what would have happened? Someone else who was removable at will by President Trump, perhaps Acting Director Mulvaney, would have been put in charge, and what was the position of the Trump administration on this case? It was that the case should proceed, and that was the position at the time, uh, that the, the, the decision below was, uh, issued. It's, and it has continued to be the position of, of the Bureau and of the government, uh, throughout the, the entire life cycle of this case, and as this court noted, uh, in its en banc decision previously in Collins, it, it makes no sense of the separation of powers to, uh, provide a result that is contrary to the specific wishes of the President and, and the President's alter egos here. Uh, so we submit that that, that there's no, no theory of remedy that allows a defen- that, that suggests the defendant should be put in a demonstrably better position than they would have been in before. But, but Mr. Deal, if that were so, why did there's a constitutional injury, and that, uh, the question then becomes ratification, which Saylor Law didn't reach? Your Honor, the, the majority opinion in Collins, uh, considered that argument. That was an argument raised by Justice Gorsuch, and, and it rejected it, uh, Your Honor. No, but Saylor Law, I don't disagree with that, but, um, I, at the same time, the, the un- there, Collins did, Collins set up the basis by which one assumes that there's a violation here, which is that the President would have removed Director Cordray ASAP. And so that's the premise we're working with, I believe, and I didn't think you had contested it, but, um, uh, then the question is what makes that action retroactively okay? Well, uh, here, the actual action that we're talking about is the filing of the complaint, right? This is a motion for judgment on the pleadings, and there was no problem with the complaint, even under the- even if you think that it's enough for someone just to say, well, the President might have removed the direct- Director if he, if he had the opportunity. That desire to remove the director had no impact on the complaint whatsoever. The only, the, you know, the, the only thing is that basically it affected the timing of when President Trump could put into place an, an alter ego who then approved the, the continuation of the case. So there's no, uh, there's no theory of harm here that would entitle them to a remedy that puts them in a, in a better place than they would have been absent the removal provision. Um, and if I might- Well, what about the appropriations problem? Assuming that there's a, that it's problematic under the appropriations clause, what is the remedy there? Uh, Your Honor, in that case, you would, uh, sever whatever the, whatever problematic aspect you identified with respect to the appropriation. And I would, uh, predict that if you did that, we would then probably ask you for a stay so that we could, uh, either seek further review or, or, or figure out what was next. I think, but I would absolutely urge the court not to reach that result. It's inconsistent with the text of the constitution, with the constitutional history, uh, with the Supreme Court's cases, with, uh, all of the district court cases that have agreed with us, uh, and a variety of, uh, appellate decisions. Well, I, I get all that counsel. I'll, I'll grant you that we're, we're talking hypothetically or arguendo. Yes. If we find that appropriations cause violation though, what, what is plaintiff's remedy there? I mean, I, I get all your arguments about the removal provision and what the Supreme Court case law gives us as far as guidance for that, but what about, what about the appropriations? Are we in a but-for world? Are we in a, I mean, obviously per Judge, Judge Elrod's point, we're in a remand world perhaps, but what, what is the remedy that the, that the defendants get? Uh, Your Honor, I, I, I think that we would need to, uh, uh, address that in, in briefs after any such opinion. I don't think the parties have, have really engaged on that question, but I think that you would need to make, argue that one thing you would look at is whether or not any problem with the way that the Bureau was appropriated made any action taken by the Bureau unlawful. Uh, and I, I'm not sure why it, it would necessarily, but I think that with the parties would need to, to brief that, uh, that point further, at least in, in our view. Counsel, it seems to me both arguments today were being urged by the government attorneys, able advocates, basically to hold, there is no relief for the plaintiff who has identified accurately a constitutional defect in legislation that created the agency that is after the Supreme Court. Do you have any answer to the question of incentives, to the question of some, uh, benefit to lawyers who see that? Are we insulating in the future these sort of defects, except in rare situations where there's enough of a but-for relationship? Is that what the Supreme Court's told us to do in Collins, is to, is to basically prevent these cases from ever having a financial incentive for plaintiffs? I don't think that's right, Your Honor, because the fundamental theory of these cases is that there was a, you know, a constitutional problem with the, uh, with, with the statutory structure and that the person who was making the decisions was unconstitutionally insulated from, uh, from presidential control. And all we're saying is that are put in the position that they would have been absent that, uh, unconstitutional insulation, then they, then they've gotten all the relief that they're entitled to. You know, just, you know, in a, in the context of a criminal case, a criminal defendant says, there was this problem at my trial. The result is to provide a new trial, not to enter, uh, judgment in favor of the defendant, except in, in very rare cases. So I think there's plenty of incentive for parties to raise arguments that say, you know, the way the process in effect, uh, for the, how the decision here was reached, uh, wasn't proper and I'm entitled to a, a correct process. And, and that's what you see happen, uh, in, even in appointments cases where, where they're obviously sort of a different premise, uh, uh, where there's, uh, there's a, where you have somebody who is not acting with, with lawful authority. Here, you have a, an executive branch official who is acting, who had full authority, uh, to, uh, to take the actions that he did. Well, let me ask you, Mr. Deal. Um, what do you say, you know, just play along with me, because I mentioned ratification a couple of times. Suppose the, uh, Supreme Court's two-pronged tests in NRA political victory fund applies. How does CFPB propose to meet those? Uh, sure. Absolutely, Your Honor. So on the, on the first prong, uh, the Bureau had the authority to file the complaint when it did. I, I heard, um, defendants to lightly contest that point. Uh, but, you know, I think it's, it's clear from Collins that the Bureau had the authority, possessed the authority, all of the functions, the director possessed all of the functions, the powers of his office. So we clearly meet, uh, prong one. And then with respect to prong two, because the Bureau had the authority to file the complaint, it satisfied the statute of limitations. The statute of limitations, uh, was, was met. There was no requirement of the statute of limitations that was not satisfied. And that's very different from the situation, the scenario in NRA political victory fund, uh, where the, uh, the party that initially filed the, the cert petition in that case did not have the lawful authority to take the action when it did. And so therefore it didn't, it didn't satisfy the statutory requirement. Here, the Bureau had the authority to act and it, and it in fact did act. Uh, and so therefore the, the statute, there's no statute of limitations problem here at all. And if, if that were not enough, uh, we think that it would be improper to interpret the statute of limitations, uh, to begin running and to expire, uh, before the government could actually, uh, proceed, which is what the theory that defendants, uh, uh, rely on. And then on the point about equitable estoppel, we did not waive any ability to, to raise or equitable tolling. Uh, sorry, Your Honor. Uh, we, we didn't waive that, uh, our ability to make that point. If the court goes back and looks at the, uh, filing that the brief filing that we did on ratification, the district court, uh, as are called the last sentence of that, uh, statement says, you know, the, the Bureau stands ready to provide additional briefing of the court requests. So we didn't, in that case, we didn't file a reply because the court had not asked us to do so. That wasn't a normal, um, you know, motion opposition reply, uh, situation. So, so that's the... But in, um, Collins and in Saleh law, uh, Justice Thomas points out that there could be a multitude of constitutional infirmities that would make an act like this enforcement, uh, action void or voidable or whatever. But, um, uh, if, uh, the complaint was not valid when it was initiated because of a constellation of constitutional infirmities or because of the, um, appropriations problem, um, then there would no, then it was not ratified properly, correct? I know your, no, Your Honor, I don't, I don't think we would, uh, uh, agree with that. Um, it may just be because I'm, uh, I apologize. I'm not sure I entirely understand the question. If, if the point is, if the Bureau lacked the authority to file the complaint, notwithstanding what, what Collins says, uh, then would we be able to ratify at the time? NRA Victory Fund has two prompts that the initial filing of the complaint had to be valid and authorized. And as I understand All-American's argument, it is that when, um, um, the acting director came in under the Trump admin, Mulvaney came in, the statute of limitations had passed at that point. Uh, Your Honor, as a factual matter, I, we would, we would dispute that particularly with respect, uh, to the, uh, check cashing claims, which the complaint, uh, does not suggest, uh, had ended. Uh, so there, there is a, uh, that would be an issue I think that, uh, we would need to address, uh, below to the extent that the, the court thought that, uh, the, that, that there was a question about the timing of, of acting director Mulvaney's ratification. So I don't, I don't think that the court has evidence before it in that hypothetical world where the Bureau's initial filing of the complaint, uh, was invalid, which of course it, it was not invalid. It was clearly, clearly valid we think under, under Collins and under the Supreme Court's decision in sale of law. If the court has no further questions, uh, we'd ask, uh, the court to, uh, affirm the dismissal, affirm the denial of, uh, defendant's motion for judgment on the pleadings. Thank you, counsel, Mr. Deal. I'm sorry. Uh, Mr. Shelper. Hi, thank you, your honor. Um, just a few quick responses. First of all, the, uh, the CFPB's main argument as to why all American has not suffered a remediable injury is that, uh, is that the forecast removal provision did not affect the filing of this complaint. Now as a preliminary matter, we would certainly contest that as my colleague mentioned, the president, uh, president Obama certainly thought that he was bound by the forecast removal provision and defended it. And director Cordray for his whole tenure certainly thought that he was insulated from, from any, uh, any influence by the president. If there were any doubts on that score in this court thought that that was dispositive, we would ask the court to, to remand for further investigation into that question. But we don't think that that's necessary because we also clearly, uh, all American has suffered injury from the implementation of this, uh, lawsuit from the prosecution of the lawsuit ongoing for years, but Collins court, uh, considered that to be, uh, a plausible, um, basis for a remediable injury in Collins. It was an acting director that had, uh, initiated the third amendment, but that it was implemented by, uh, by directors that were insulated from presidential removal. So that implementation continued to cause injury. Mr. Shelfer. Um, I have a question about that. It's a two-part question. Um, you, the remedy you're asking for is dismissal of the complaint, right? That's right. Is the premise of that request that the director lacked authority to institute the complaint initially, and then to maintain the complaint thereafter. Okay. So that's question one question two is, is the remedy you're asking for dependent only on the removal clause violation, or does it also depend in combination with the appropriations clause violation? Because I thought that your brief seemed to link those two with respect to remedy. Oh, thank you. Let me take the second one first quickly. So we think that either the appropriations clause violation or the forecast removal violent forecast removal violation are both independent bases for dismissing this case. We think that, uh, that seal a law, for instance, um, that the CFPB relies on seal a law as if it had, uh, uh, addressed this funding provision would, it did not at all. In fact, it said that in combination, uh, the appropriations clause plus the forecast removal provision exacerbated the constitutional problem, but the court never considered the appropriations clause standing alone. That is what this court is, is, uh, faced with for the first time as a, as a binding court. No, I get that. So I get the answer. What about the first question? Okay. So, uh, yes, your honor. So the first question is, um, is, is our basis for remedy dependent on there being a defect in the filing? Is that right? As well as the main factor in the authority to file the complaint and in the authority to maintain the action thereafter. It's, it's definitely, um, the second we think we, we win, even if the CFPB did have the authority to file this enforcement action to begin with, because, uh, the, the, uh, prospect of an individual being prosecuted by a, an agency that is unconstitutionally, at least as a functional matter insulated from presidential control inflicts a constitutional injury. And it's a, it's a structural separation of powers, constitutional injury. Uh, and there's no sense in as the CFPB and you think, so, and you think that's consistent with what Colin said about the difference between an appointment clause defect and an appointment defect and a removal defect. Yes, your honor. Yes. The way that I read Collins is that generally the court held a forecast removal provision violation will not inflict a remediable constitutional injury. Unlike an appropriations clause violation, which always inflicts a remediable constitutional injury. But then the court crafted an exception, if I may, a CFPB shaped exception with the court clearly had the CFPB in its mind when it was crafting this. And it said in certain rare circumstances that are met here, uh, and a forecast removal provision will inflict a remediable constitutional injury. And once that happens, that injury is at the same level as any other separation of powers. It's about the, about when the injury is inflicted, not the degree of, uh, of injury once it is inflicted. Mr. Shelfer, I want to make sure that I understand with precision, um, your argument, um, as I understand it, all American doesn't argue that it can satisfy a, but for test, all American argues that a, but for test is wrong, that Collins did not in fact, um, announce a, but for test, is that correct? I would say this, your honor. So you're correct that our frontline argument is that Collins did not create a counterfactual hypothetical requirement. But, uh, if the court were to disagree with that, um, uh, well, let me first explain why it's especially inappropriate in this context of an enforcement action, because these, these, um, uh, you know, low level enforcement actions will not rise to the level of, of presidential review. And so it's really impossible to, uh, to just use one's imagination to hypothesize how a later, uh, director that, um, was in office at an earlier time might have affected, uh, what the enforcement priorities might've been in an earlier time. If the statute was different, I would point the court to cases like young versus United States 41 U S seven 87, which explains that even when the implementation of, of, uh, an enforcement action is valid, the prosecution of it can still create a separation of powers injuries. And there's no harmless error review because prosecutorial discretion is so vast and, and prosecutors are subject to so many variables, political, legal, factual, that there's no way to unscramble the egg. There's no way to turn back the clock and instead court simply assume error. But if, uh, if the court thought that a, but for tests were required here, uh, we, he would respectfully ask the court to remand for further investigation on that question. Thank you. Cancel. We have your argument. We will take this case and the prior case under submission that will conclude the arguments for the day. The court will be in recess until nine o'clock in the morning. Thank you.